## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HUGH CAMPBELL McKINNEY
5985 S 45th E
Idaho Falls, ID 83406

      Plaintiff,

      v.

MARK T. ESPER
*in his official capacity as*
*Secretary of the United States Army*
101 Army Pentagon
Washington, DC 20310-0101,

      Defendant.

Civil Action No. 1:18-cv-371

## <u>COMPLAINT</u>

Army Sergeant First Class Hugh C. McKinney, retired ("McKinney"), brings this action challenging the decision by the Secretary of the U.S. Army, acting through the Army Board for Correction of Military Records ("ABCMR"), disapproving award of the Purple Heart. McKinney sustained a traumatic brain injury ("TBI") from an improvised explosive device ("IED") blast on October 9, 2005 in Kirkuk, Iraq while he was deployed during Operation Iraqi Freedom. At the time of this injury, there was no accepted, systematic approach for evaluating a service member for a mild TBI in military operational settings. Army recognized this in 2011 and issued clarifying guidance about how a mild TBI could meet the Purple Heart standard. McKinney then sought such recognition in 2013. Yet Army has refused to correct its error and remove the injustice of not awarding McKinney the Purple Heart for his TBI that was caused by enemy action.

- 1 -

## THE PARTIES

1.      Plaintiff Hugh Campbell McKinney is a disabled veteran of Operation Iraqi Freedom with a home address of 5985 S 45th E, Idaho Falls, ID 83406.  He has been married for 28 years and has five children.

2.      Defendant Mark T. Esper is the Secretary of the United States Army, having an office at 101 Army Pentagon, Washington, DC 20310-0101.  He is named as Defendant solely in his official capacity as Secretary.  *See* 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. . . . [S]uch corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department.").  The board through which the Secretary of the United States Army acts is the ABCMR.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

4.      This Court further has jurisdiction over this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, which permits private parties to sue the federal government to seek "relief other than money damages" while "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," when there has been "final agency action for which there is no other adequate remedy in a court."  McKinney is not seeking any monetary damages in this action; he only seeks equitable relief.  ABCMR's

disapproval of McKinney's eligibility for the Purple Heart award, including on reconsideration, thus is subject to review by the Court because the APA waives sovereign immunity for such an equitable action in view of a final decision by ABCMR, and there is no other adequate remedy in a court. ABCMR is an agency as defined in the APA, 5 U.S.C. § 701(b)(1) ("'agency' means each authority of the Government of the United States . . .," with certain exceptions not relevant to this action).

5.      In addition, this Court has jurisdiction under 28 U.S.C. § 1361 which grants district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

6.      This Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 & 2202.

7.      Venue lies in this District under 28 U.S.C. § 1391(e)(1)(A). The Secretary is located at 101 Army Pentagon, Washington, DC. The United States Army also is located in Washington, DC.

## BACKGROUND AND ALLEGATIONS

### MCKINNEY'S SERVICE RECORDS INDICATE THE TELLTALE SIGNS OF A TBI AND REFERRALS TO MEDICAL PROFESSIONALS

8.      On June 29, 2004, McKinney was ordered to active duty in the Idaho Army National Guard in support of Operation Iraqi Freedom. In late November 2004, he was deployed to Iraq, where he was assigned to the 2-116th Armor Battalion. In 2005, he

served as a platoon sergeant during close combat incidents and infantry operations, under the active Army 42nd Infantry Division.

9.      While leading a mounted patrol in Kirkuk, Iraq on October 9, 2005, an Improvised Explosive Device ("IED") detonated 15-20 meters from his High Mobility Multipurpose Wheeled Vehicle ("HMMWV"), a.k.a. Humvee.  The IED had been placed near a bridge and attached to a light pole using barbed wire.  When the blast occurred, McKinney was in the left, rear seat of the vehicle, the same side of the vehicle as the explosion from the roadside bomb.   In an unrebutted, sworn statement, the Tactical Commander ("TC") in the vehicle stated that McKinney "took the brunt of the blast," "seemed to not realize that the blast had come and gone," was "shaken up," and "really dazed."  The TC also stated that McKinney's "mind was [i]n a loop [from] the blast for a few minutes"; in other words, he was briefly in-and-out of consciousness.

10.     The concussive force of the explosion must have been tremendous; the TC in the Humvee characterized the IED as consisting of either a 120mm or 155mm artillery round.  Such armament is widely recognized as a high explosive.

11.     Despite the stun of the concussive force to McKinney's body, he remained with the men under his command.  McKinney did not seek medical attention at the time, which would have required him to leave his command and travel to a forward operating base ("FOB") in a different area of Iraq from his fire base in Kirkuk.  At that time and then in the final days of his deployment, applicant's work ethic and commitment to the men under his command was such that he continued his duty without reporting to a

medical facility at a different FOB. McKinney didn't want "to put men's lives in jeopardy going on a mission to the F.O.B. as a medical concussive injury request."

12. Nor was McKinney medically evaluated in the field after the blast for a mild to moderate TBI. There simply was no medic accompanying McKinney's mounted patrol. Regardless, any such evaluation—had one occurred—would have been unreliable and thus futile as not being based on a TBI screening tool approved by the military at the time. Indeed, in October 2005, the Army had no protocol for conducting such a medical evaluation in a military operational setting. Specifically, there was no protocol at that time for identifying potential mild traumatic brain injuries arising from exposure to concussive forces. It was not until 2006 that a TBI screening tool called the Military Acute Concussion Evaluation ("MACE") was developed by the military's Defense and Veterans Brain Injury Center ("DVBIC"). It was not until December 22, 2006 that DVBIC released a "Clinical Practice Guideline and Recommendations" in which mild TBI screening of service members with the MACE tool was recommended in military operational settings, *i.e.* in theatre.

13. Although the explosion sprayed McKinney's Humvee with shrapnel, dirt, and rocks, the debris did not directly impact his body. Rather, the external force of the explosion, *i.e.,* the concussive force, impacted his body due to his close proximity to the blast. It is clear from McKinney's service records and his subsequent evaluations and treatments by the Department of Veterans Affairs ("VA") that McKinney suffered a TBI from the blast.

14.     Just three weeks following the October 9, 2005 explosion, McKinney's deployment to Iraq ended.   On his post-deployment service medical record, DD Form 2796 Post-Deployment Health Assessment dated November 1, 2005 and signed by McKinney and a physician's assistant (PA-C), he indicated in response to Question 6 that he developed the following symptoms during deployment: "muscle aches," "numbness or tingling in hands or feet," and "ringing of the ears."   McKinney's response to question 14 indicated that during his deployment he was "often" exposed to "loud noises" and "excessive vibration."   In the Health Assessment portion, McKinney also indicated that he had concerns that events during his deployment may affect his health.

15.     While still in the Army National Guard Mobilized Service, however, on June 10, 2006, McKinney completed a DA Form 2173 Statement of Medical Examination and Duty Status and a DD Form 2900 Post-Deployment Health Reassessment—signed by McKinney and a physician's assistant ("PA-C")—with much more detail about his medical problems from his service in Iraq:

> a. question 5 response indicating "yes" as to whether "during your deployment were you wounded, injured, assaulted or otherwise physically hurt";
>
> b. question 6 response indicating the following "deployment-related condition[s] or concern[s]": "weakness," "headaches," "muscle aches," "numbness or tingling in hands or feet," "ringing of the ears," "dizziness, fainting, light headedness," and "difficulty remembering";
>
> c. question 7 response indicating the following "persistent major concerns regarding the health effects of something you believe you may have been exposed to or encountered while deployed": "loud noises," "excessive vibration," and "blast or motor vehicle accident";

    d.  question 12 response indicating "very difficult" regarding "how difficult have these problems made it for you to do your work, take care of things at home, or get along with other people";

    e.  question 13 response indicating "yes" to "would you like to schedule a visit with a healthcare provider to further discuss your health concern(s)"; and

    f.  Health Care Provider "Assessment and Referral" item 5, completed by the PA-C, indicated that the physical symptoms were a "major concern" and referrals were made in items 6 and 10 to "primary care, family practice," "Mental Health Specialty Care," "Military OneSource," "VA Medical Center or Community Clinic," and "Vet Center."

16.    It was not until October 2006—after McKinney had been discharged and both his post-deployment health assessment and reassessment were completed—that a law was passed requiring DoD, and thus Army, to implement TBI screening (within six months of enactment of the law) as part of the routine post-deployment health assessments of service members returning from Iraq. *See* Pub. L. No. 109–364, 120 Stat. 2303, 2304 (Oct. 17, 2006).

17.    And there was a further delay in accurately diagnosing and acting upon McKinney's TBI because it took substantial time after discharge before he was seen in a so-called "Polytrauma System of Care." VA now recognizes the importance of such care:

> *Polytrauma* occurs when a person experiences injuries to multiple body parts and organ systems often, but not always, as a result of blast-related events. TBI frequently occurs in polytrauma in combination with other disabling conditions, such as amputation, burns, spinal cord injury, auditory and visual damage , spinal cord injury (SCI), post-traumatic stress disorder (PTSD), and other medical conditions. Due to the

> severity and complexity of their injuries, Veterans and Service Members with polytrauma require a high level of integration and coordination of clinical care and other support services.

*See* **Ex. 1**, *What is Polytrauma?*, available at https://www.polytrauma.va.gov/understanding-tbi/definition-and-background.asp.

18.     Less than two years after being exposed to the IED blast, on July 21, 2007 at the age of 46, McKinney suffered a left hemispheric, ischemic stroke event, known as a cerebrovascular accident (CVA).

19.     Whereas McKinney's health prior to his tours of duty in Iraq was assessed *by Army* to be "excellent," the IED blast on October 9, 2005 permanently altered his life. Indeed, a VA Rating Decision, dated 15 May 2014, states (with emphasis added) that "the evidence shows [McKinney] currently has a ***total service-connected disability***, permanent in nature" and "the evidence documents [McKinney is] permanently and totally disabled." The VA concluded that "[a]n overall 100 percent evaluation is assigned for [McKinney's] traumatic brain injury residuals based on the highest level of severity of 'Total'."

20.     The medical community has long regarded TBI as a disease process and continues to characterize TBI in that manner. *See, e.g.*, **Ex. 2**, T.K. McIntosh et al., *The Dorothy Russell Memorial Lecture: The Molecular and Cellular Sequelae of Experimental Traumatic Brain Injury: Pathogenetic Mechanisms*, 24 NEUROPATHOLOGY AND APPLIED NEUROBIOLOGY 251 (1998) ("TBI should be considered as both an inflammatory and/or a neurodegenerative disease."); **Ex. 3**, Randall M. Chesnut et al.,

EVIDENCE REPORT/TECHNOLOGY ASSESSMENT NUMBER 2: REHABILITATION FOR TRAUMATIC BRAIN INJURY 12 (Agency for Health Care Policy Research, U.S. Public Health Service 1999) ("In TBI, the disease process begins at the moment of impact and extends thereafter for a protracted period of time."); **Ex. 4**, Ross D. Zafonte, *Update on Biotechnology for TBI Rehabilitation: A Look at the Future*, 21 J. OF HEAD TRAUMA REHABILITATION 403 (2006) ("TRAUMATIC BRAIN INJURY (TBI) exists as a complex and multifactorial disease process"); **Ex. 5**, Brent E. Masel & Douglas S. DeWitt, *Traumatic Brain Injury: A Disease Process, Not an Event*, 27 J. OF NEUROTRAUMA 1529 (2010) ("TBI is a chronic disease process, one that fits the World Health Organization definition"); **Ex. 6**, BEST PRACTICES IN THE MANAGEMENT OF TRAUMATIC BRAIN INJURY, American College of Surgeons, Committee on Trauma (2015) ("[t]raumatic brain injury is a disease process"; "TBI is a complex disease"); **Ex. 7**, Janet M. Powell, *Special Issue on Occupational Therapy for Adults With Traumatic Brain Injury*, 70 THE AMERICAN JOURNAL OF OCCUPATIONAL THERAPY (2016) ("for many, TBI is not a one-time event but rather the start of a lifelong chronic disease process"); **Ex. 8**, Gary B. Kaplan et al., *Pathophysiological Bases of Comorbidity: Traumatic Brain Injury and Post-Traumatic Stress Disorder*, 35 JOURNAL OF NEUROTRAUMA 210 (2018) ("TBI is, therefore, a brain disease process").

21.   Research published in a prominent, peer-reviewed medical journal—and written by a doctor from the VA—has shown that "TBI *is* associated with ischemic stroke, independent of other major predictors." *See* **Ex. 9**, James F. Burke et al.,

*Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 NEUROLOGY 33 (2013) (emphasis added).  The research paper reported:

> The risk of stroke after TBI persisted even when excluding cases of stroke within 60 days of trauma. . . . We also found that the TBI-stroke association was of considerably greater magnitude in the population younger than 50 years (OR 1.56) vs those 50 years and older (OR 1.22), suggesting that TBI may be uniquely important in younger patients.

*Id.* at 36.   Individuals suffering a TBI were found to have a significantly greater likelihood of having a stroke compared to those who did not suffer a TBI, over an average follow-up period of more than two years (28 months).  *Id.* at 35.  Still further, the authors cautioned "it is possible that the reported association between TBI and stroke represents an underestimate." *Id.* at 37.

22.   The authors also dispelled any myth that a direct or penetrating head injury—rather than concussive force—is the harbinger of stroke.  They "analyzed the risk of ischemic stroke for TBI subtypes," including skull fracture, concussion, cerebral laceration/intracranial hemorrhage, other intracranial injury, and unspecified TBI. *Id.* at 34.   Based on their analysis, "[a]ll TBI subtypes had a similar magnitude of association with ischemic stroke."  *Id.*

23.   The TBI-stroke link has been independently confirmed by other researchers.  *See, e.g., See* **Ex. 10**, Chien-Chang Liao et al., *Stroke Risk and Outcomes in Patients With Traumatic Brain Injury: 2 Nationwide Studies*, 89 MAYO CLINIC PROCEEDINGS 163 (2014) ("Traumatic brain injury was associated with risk of stroke" and "[p]atients with mild TBI . . . were at increased risk for stroke."); *See* **Ex. 11**, Yi-Kung Lee et al., *Increased Risk of Ischemic Stroke in Patients With Mild Traumatic Brain*

*Injury: A Nationwide Cohort Study*, 22 SCANDINAVIAN JOURNAL OF TRAUMA, RESUSCITATION AND EMERGENCY MEDICINE 66 (2014) ("Mild TBI is an independent significant risk factor for ischemic stroke."); *See* **Ex. 12**, Lindsay Wilson et al., *The Chronic and Evolving Neurological Consequences of Traumatic Brain Injury*, 16 THE LANCET NEUROLOGY 813 (2017) ("TBI represents a risk factor for a variety of neurological illnesses, including . . . stroke . . .").

### AS TBIS BECAME "BETTER UNDERSTOOD" YEARS AFTER MCKINNEY'S INJURY, THE MILITARY "CLARIFIED" PURPLE HEART ELIGIBILITY CRITERIA

24.     Prior to 2006, there was no accepted, systematic approach for evaluating a service member for a TBI in military operational settings.

25.     It was not until 2006 that a TBI screening tool called the Military Acute Concussion Evaluation ("MACE") was developed by the military's Defense and Veterans Brain Injury Center ("DVBIC"). *See, e.g.,* **Ex. 13**, DEFENSE AND VETERANS BRAIN INJURY CENTER: HISTORY, *available at* http://dvbic.dcoe.mil/history. And it was not until late in 2006 that DVBIC released a "Clinical Practice Guideline and Recommendations" in which mild TBI screening of service members with the MACE tool was recommended in military operational settings, *i.e.* in theatre. *See* **Ex. 14**, available at https://web.archive.org/web/20080913131932/http://www.pdhealth.mil:80/downloads/clinical_practice_guideline_recommendations.pdf. The MACE assessment emerged with the realization that "[t]raumatic brain injury (TBI), in both times of peace and times of war is a significant public health issue for the military." *See* **Ex. 15**, Louis French et al., *The Military Acute Concussion Evaluation (MACE)*, 8 JOURNAL OF

SPECIAL OPERATIONS MEDICINE 68 (2008), available at https://web.archive.org/web/20161215051554/http://www.socom.mil/JSOMDocs/2008168French.pdf.

26.    In May 6, 2008, the Headquarters of the Multi-National Corps-Iraq (the so-called "coalition" forces) issued a memorandum "to all medical personnel in the Iraq Theater of Operations who [were] directly or indirectly involved in the provision of healthcare to patients with confirmed or suspected concussive injuries." *See* **Ex. 16**, Memorandum from COL Joseph Caravalho, Jr., Headquarters, Multi-National Corps-Iraq ("MNC-I") re "MNC-I Policy on Mild Traumatic Brain Injury" (May 6, 2008), at 4, available at https://web.archive.org/web/20130320141919/http://www.pdhealth.mil/downloads/mTBI_Policy6may.pdf. The memorandum "provide[d] theater-specific guidance for the medical evaluation, management and documentation of mild traumatic brain injury (mTBI)/concussion" and stated:

> For Army forces, a diagnosis of concussion must include the military operational definition of mTBI and must have evidence and medical record documentation of an alteration of consciousness. In many cases mTBI with minimum medical intervention will not warrant this award. Providers should not discuss Purple Heart criteria with patients.

*Id.* at § 6.b.(12).

27.    Details concerning the U.S. military's continuing resistance to recognizing "invisible" wounds of war—mild traumatic brain injuries ("mTBI")—with Purple Heart awards began to emerge in 2010:

> The U.S. Army honors soldiers wounded or killed in combat with the Purple Heart, a powerful symbol designed to recognize their sacrifice and service.

Yet Army commanders have routinely denied Purple Hearts to soldiers who have sustained concussions in Iraq, despite regulations that make such wounds eligible for the medal . . .

Soldiers have had to battle for months and sometimes years to prove that these wounds, also called mild traumatic brain injuries, merit the honor . . . Commanders turned down some soldiers despite well-documented blast wounds that wrenched their minds, altered their lives and wracked their families.

\* \* \*

The denials of Purple Hearts reflect a broader skepticism within the military over the severity of mild traumatic brain injury, often described as one of the signature wounds of the conflicts . . .

High level medical officials in the Army debated whether head traumas that are difficult to detect, often leaving no visible signs of damage, warrant the award . . . Most people who sustain such blows, also known as concussions, recover on their own, but studies show 5 percent to 15 percent may have long-term impairments.

\* \* \*

The military's regulations to document the wound and treatment can make it difficult for someone with a mild traumatic brain injury to prove that the award criteria are met. Treatment for a head injury in the immediate aftermath of combat can be as little as bed rest, or pain medications which are not always noted in medical records.

Once they return home, some soldiers don't realize they have problems until months or years after the injury -- making it difficult to prove a link between the blast and their symptoms.

\* \* \*

. . . For at least 50 years, military regulations have recognized concussions as an injury meriting the Purple Heart. . . .

\* \* \*

. . . [C]ommanders often relied on technicalities to block awards. For instance, the military defines a "medical officer" as a physician with officer rank.  That means that soldiers treated by nurses or combat medics would not necessarily qualify.

* * *

> Soldiers turned down for the Purple Heart can appeal, but face a grinding administrative battle to reverse the decision.
>
> If they have no documentation of their wounds, they must find witnesses and gather sworn statements, an especially daunting task for those who have cognitive deficits as a result of brain injuries.

See **Ex. 17**, T. Christian Miller, *Soldiers With Brain Trauma Denied Purple Hearts, Adding Insult to Injury*, PROPUBLICA (Sept. 8, 2010), available at https://www.propublica.org/article/soldiers-with-brain-trauma-denied-purple-hearts-adding-insult-to-injury.

28.     By March 2011, it was reported that the Army would issue new guidance concerning award of the Purple Heart as "part of an ongoing effort to ensure that soldiers, commanders and medical officers take so-called 'invisible wounds' seriously." *See* **Ex. 18**, T. Christian Miller and Daniel Zwerdling, *Army Clarifies Purple Heart Rules for Soldiers*, heard on MORNING EDITION, NPR (Mar. 17, 2011), available at https://www.npr.org/2011/03/17/134604533/army-revising-purple-heart-rules-for-soldiers; *see also* **Ex. 19**, transcript available at https://www.npr.org/templates/transcript/transcript.php?storyId=134604533.[1]

29.     By April 28, 2011, the Department of Defense ("DoD") announced that "more clarity" would be provided concerning when Purple Hearts should be awarded for TBIs:

> U.S. servicemembers have long been eligible to receive the Purple Heart Medal for the signature wounds of the current

---

[1] McKinney submitted a copy of this transcript to the Awards & Decorations Branch of U.S. Army Human Resources Command ("Army HRC") in 2013 when he appealed Army HRC's disapproval of his Purple Heart request, discussed *infra*.

wars -- mild traumatic brain injuries and concussions -- but now there is more clarity on how medical criteria for the award are applied, Defense Department officials said yesterday.

The criteria for the Purple Heart award state that the injury must have been caused by enemy action or in action against the enemy, and has to be of a degree requiring treatment by a medical officer.

But it may be difficult to determine when a mild traumatic brain injury, or TBI, or a concussive injury that does not result in a loss of consciousness is severe enough to require treatment by a medical officer.

"This is why we created this baseline standard," DoD spokeswoman Eileen Lainez said.

DoD allows the award of the Purple Heart even if a servicemember was not treated by a medical officer, as long as a medical officer certifies that the injury would have required treatment by a medical officer had one been available.

DoD officials said that as the science of traumatic brain injuries becomes better understood, guidance for award of the medal will evolve.

"The services are not able to speculate as to how many servicemembers may have received a mild TBI or concussion but did not seek or receive medical treatment," Lainez said. "Therefore, each military department will establish its retroactive review procedures in the near future to ensure deserving servicemembers are appropriately recognized."

Retroactive reviews would cover injuries suffered since Sept. 11, 2001, she added.

The Marine Corps has issued clarifying guidance to ensure commanders in the field understand when the Purple Heart is appropriate for concussions.

Army officials are preparing to issue their guidance and ask soldiers to wait until submission requirements are published through command channels and on the Human Resources

Command website at http://www.hrc.army.mil before submitting or resubmitting nominations for the Purple Heart Medal for concussion injuries.

Once the Army publishes its requirements, officials said, soldiers should resubmit requests through their chains of command.

*See* **Ex. 20**, Jim Garamone, *DoD Issues Purple Heart Standards for Brain Injury*, AMERICAN FORCES PRESS SERVICE (Apr. 28, 2011), available at https://www.army.mil/article/60078/dod_issues_purple_heart_standards_for_brain_injury.[2]

30.   Army then issued its Directive 2011-07 on April 29, 2011 stating in part:

1.   The purpose of this message is to inform all members of the Army (leaders, soldiers, and civilians) that the Secretary of the Army has approved Army Directive 2011-07 (awarding the Purple Heart).

2.   The directive provides clarifying guidance to ensure the uniform application of advancements in medical knowledge and treatment protocols when considering recommendations for award of the purple heart for concussions (including mild traumatic brain and concussive injuries that do not result in a loss of consciousness).   This message does not change the standards for award of the PH for concussion injuries.   This policy is retroactive to 11 September 2001 . . .

3.   Clarifying guidance on award of the purple heart for concussions.   When recommending and considering award of the purple heart, the chain of command will ensure the criteria in paragraph 2-8 of [AR 600-8-22, Military Awards (11 Dec. 2006)] is met, and that both diagnostic and treatment factors are present and documented in the soldier's medical record by a medical officer.   Paragraph 4c below defines medical officer.

A.   The following non-exclusive list provides examples of signs, symptoms or medical conditions

---

[2] McKinney submitted a copy of this article to Army HRC in 2014 when he appealed Army HRC's disapproval of his Purple Heart request, discussed *infra*.

documented by a medical officer or medical professional that meet the standard for award of the PH:

(1) diagnosis of concussion or mild traumatic brain injury;

(2) any period of loss or a decreased level of consciousness;

(3) any loss of memory for events immediately before or after the injury;

(4) neurological deficits (weakness, loss of balance, change in vision, praxis (i.e. difficulty with coordinating movements), headaches, nausea, difficulty with understanding or expressing words, sensitivity to light, etc.) that may or may not be transient; and,

(5) intracranial lesion (positive computerized axial tomography (CAT) or magnetic resonance imaging (MRI) scan).

B.   The following non-exclusive list provides examples of medical treatment for concussion that meet the standard of treatment necessary for award of the PH:

(1) limitation of duty following the incident (limited duty, quarters, etc.);

(2) pain medication such as acetaminophen, aspirin, ibuprofen, etc. to treat injury, such as headache;

(3) referral to neurologist or neuropsychologist to treat the injury; and,

(4) rehabilitation (such as occupational therapy, physical therapy, etc.) to treat injury.

\* \* \*

4.  Additional guidance:

A.   Award of the purple heart may be made for wounds (including mild traumatic brain injuries and concussive injuries) treated by a medical professional other

than a medical officer, provided a medical officer includes a statement in the soldier's medical record that the extent of the wounds was such that they would have required treatment by a medical officer, if one had been available to treat them.

B.   A medical professional is defined as a civilian physician or a physician extender.   Physician extenders include nurse practitioners, physician assistants, and other medical professionals qualified to provide independent treatment (to include special forces medics).   Medics (such as combat medics – [Military Occupational Specialty (MOS) 68W]) are not physician extenders.

C.   A medical officer is defined as a physician with officer rank.   The following are medical officers: an officer of the medical corps of the army . . .

*See* **Ex. 21**, Milper Message Number 11-125, Army Directive 2011-07 (Awarding of the Purple Heart), AHRC-PDP-A (Apr. 29, 2011), available at https://www.maine.gov/veterans/docs/Milper-Message-2011-125.pdf.

31.   Army's Directive 2011-07 has been incorporated into Army Regulation 600–8–22 (Military Awards), reissued June 2015.  *See* **Ex. 22**.

## MCKINNEY'S REQUEST FOR AWARD OF THE PURPLE HEART WAS DISAPPROVED

32.   Pursuant to 10 U.S.C. § 1552(a)(1), "[t]he Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."

33.   "The [Purple Heart] is an entitlement and differs from all other awards and does not require an exception or waiver for presentation."  *See* **Ex. 22**, Army Regulation 600–8–22 (Military Awards), reissued June 2015, at § 1–17.d.

34.     "The [Purple Heart] is awarded in the name of the President of the United States and, in accordance with 10 USC 1131, effective 19 May 1998, is limited to members of the Armed Forces of the United States who, while serving under competent authority in any capacity with one of the U.S. Armed Services after 5 April 1917, have been wounded, were killed, or who have died or may hereafter die of wounds received . . . (1) [i]n any action against an enemy of the United States[;] (2) [i]n any action with an opposing armed force of a foreign country in which the Armed Forces of the United States are or have been engaged[;] (3) [w]hile serving with friendly foreign forces engaged in an armed conflict against an opposing armed force in which the United States is not a belligerent party[;] (4) [a]s the result of an act of any such enemy of opposing Armed Forces[;] (5) [a]s the result of an act of any hostile foreign force[;] (6) [a]fter 28 March 1973, as a result of an international terrorist attack against the United States or a foreign nation friendly to the United States . . . (7) [a]fter 28 March 1973, as a result of military operations while serving outside the territory of the United States as part of a peacekeeping force[; or] (8) [from] friendly fire. *Id.* at § 2–8.b.

35.     McKinney initially sought award of the Purple Heart in 2011 but his request to Army HRC was "returned without action due to the lack of required supporting documentation."

36.     McKinney resubmitted his request that he be awarded the Purple Heart to Army HRC by letter, with accompanying explanations and evidence, which Army HRC has indicated it received on February 6, 2013.  A letter from McKinney's wife, Jeanette

L. McKinney, dated January 21, 2013 accompanied the request.   In her letter,

McKinney's wife stated:

> Hugh returned from two tours of combat duty in Iraq and I could tell significant damage had happened to him.  He couldn't think, he would get confused, disoriented . . . He had several episodes of loss of consciousness throughout the 17 months after his return from Iraq that lead up to a stroke.  All signs of a TBI. . . .
>
> . . . The stroke has been service connected [by VA] as secondary to his TBI.  .  .  .  He continues to suffer from a Moderate TBI and receives care and treatment at the Salt Lake VA . . .
>
> *   *   *
>
> Hugh has tried to put the paperwork together for over a year to resubmit for his [P]urple [H]eart but he is unable to do the necessary paperwork without my assistance.  I have contacted all the soldiers we were able to find to gather sworn statements . . .
>
> According to the policy for the Purple Heart my husband Hugh meets all the requirements to be awarded the Purple Heart for TBI received in combat in Iraq, in defense of our country, during Operation Iraqi Freedom. . . .

37.     Army HRC subsequently disapproved the request by letter dated October

22, 2013:

> [McKinney] is not authorized award of the Purple Heart; therefore, this request is disapproved.   Based on the information provided, [McKinney] was injured as a result of traumatic brain injury (TBI).   However, per Army Directive 2011-07 and MILPER Message 11-125, both diagnostic and treatment factors must be present and documented in the medical record by a Medical Officer at or near the time the injury occurred.  In the medical documentation provided, it is obvious that [McKinney] was exposed to concussive forces, however lack of medical documentation linking the dates of 24 June 2005 and 9 October 2005 for TBI and treatment were not provided.  While we sympathize with [McKinney], we are

bound by Army Regulation.   The medical documentation does not justify award of the Purple Heart.

38.    McKinney filed an "appeal" to Army HRC providing further explanations and evidence, which Army HRC has indicated it received on March 24, 2014.   Again, McKinney's wife prepared the appeal documents including a "narrative" that accompanied the appeal and stated "I am helping my husband, who is a service connected combat wounded soldier . . .."

39.    By letter dated June 19, 2014, Army HRC again disapproved award of the Purple Heart:

> After careful review it has been determined that your request does not meet the criteria for the Purple Heart award; therefore, this request is disapproved.   Based on the information provided, your injury was a result of traumatic brain injury (TBI).   However, per Army Directive 2011-07and MILPER Message 11-125, both diagnosis and treatment factors must be present and documented in the medical record by a Medical Officer at or near the time the injury occurred.   In the medical documentation provided, it is obvious that you were exposed to concussive forces, however lack of medical documentation linking the dates of 9 October 2005 for TBI and treatment were not provided.   Veterans Affairs documents or diagnosis are not sufficient in itself to determine the award of the Purple Heart.   While we sympathize with you, we are bound by Army Regulation. The medical documentation provided does not justify award of the Purple Heart.
>
> If you believe this determination to be unjust, you have the right to appeal to the Army Board for Correction of Military Records (ABCMR), the highest appellate authority on personnel matters. . . .

40.     By letter dated August 7, 2015, with supporting evidence, and received by
ABCMR on August 10, 2015, McKinney appealed the disapproval of the Purple Heart
award.  His appeal noted:

> This wounded warrior, who has been rated 100% permanent
> and totally disabled by the VA as a result of his TBI, has been
> unable to prepare this appeal on his own behalf.  Only after
> engaging *pro bono* counsel to assist him could a proper
> collection and review of documentary evidence be completed
> and an appeal [be] filed with new evidence and explanation.
> [McKinney] therefore requests the waiver of any untimeliness
> in filing this appeal.

41.     The evidence before ABCMR demonstrated that McKinney incurred a TBI
on October 9, 2005 in Kirkuk, Iraq, after being exposed at close range to the concussive
force of an IED explosion while leading a mounted patrol in a HUMMV.  A sworn
written statement from the Tactical Commander ("TC") in the vehicle with McKinney
confirms the hostile action by the enemy and McKinney's dysfunction immediately
following the blast.  A Patrol/Convoy Debrief Form provided by the 116th Cavalry
Heavy Brigade Combat Team ("HBCT") corroborates the TC's statement that an IED
detonated.

42.     Five doctors (including a VA doctor who served in the Army Medical
Corp) all concur that the October 9, 2005 explosion caused McKinney to have a TBI.

43.     One of McKinney's doctors specifically stated in a medical record in March
2008:

> It is frequent that mild to moderate TBI's go undiagnosed
> initially as the service member has no outward physical
> injury, but the difficulty in performing at a higher cognitive

level shows up later, most often [noticed] by family members
post[-]deployment.

44.     McKinney's medical records reflect his account that he had a brief loss of consciousness associated with the blast.   According to the opinions of McKinney's doctors, numerous symptoms noted in McKinney's military records from November 2005 and post-service questionnaire from July 2006 corroborate his TBI from the October 9, 2005 blast, including weakness, headaches, memory problems, vision problems, dizziness, fatigue, irritability, and hand numbness.

45.     Despite the evidence he submitted, McKinney received a response letter from ABCMR dated January 25, 2017, again denying the award.  ABCMR's Record of Proceedings, dated January 24, 2017 and attached to ABCMR's letter, states:

> The evidence presented does not demonstrate the existence of a probable error or injustice.    Therefore, the Board determined the overall merits of this case are insufficient as a basis for correction of the records of the individual concerned.

46.     ABCMR's Record of Proceedings further states:

> In letters dated 22 October 2013 and 19 June 2014, the applicant was notified by the Department of the Army (DA), Awards and Decorations Branch, that his requests for the Purple Heart were denied.  Prior to making its determination, the Awards and Decorations Branch requested a medical advisory opinion from a medical doctor assigned to the Physical Review Board.  The doctor certified he had reviewed the applicant's medical records and supporting documentation. . . . ***The doctor concludes the applicant was exposed to concussive forces; however, his TBI appears to be a cumulative effect as opposed to being caused by a specific event.***  In conclusion, the doctor points out that a diagnosis of TBI by the VA is different than those required for the Purple Heart.

* * *

*There is no evidence in the available record, and neither the applicant nor his counsel submitted sufficient evidence showing he was treated by medical personnel for an injury/wound he received as a result of hostile action on or near 9 October 2005.*  According to the applicable regulation, to qualify for award of the Purple Heart, substantiating medical evidence at the time or near the time of the incident must be provided to verify that the wound was the result of hostile action, the wound must have required treatment by medical personnel, and the medical treatment must have been made a matter of official record.  For concussion, a Soldier must be removed from full duty due to persistent signs, symptoms or clinical finding, or impaired brain function for a period greater than 48 hours.

### CAUSES OF ACTION

#### COUNT I
#### ABCMR's Disapproval of the Purple Heart
#### for McKinney's TBI Violates the APA.

47.    McKinney reasserts and incorporates by reference each of the above paragraphs.

48.    McKinney applied for correction of his military record—seeking award of the Purple Heart—within three years after discovering or reasonably having discovered the error or injustice by Army, i.e., failure to award him the Purple Heart, and/or within a time frame that is reasonable "in the interest of justice."  *See* 10 U.S.C. § 1552(b); 32 C.F.R. § 581.3(d)(2).

49.    McKinney's application for correction was first made by letter, with accompanying explanations and evidence, which HRC has indicated it received on February 6, 2013.  That date satisfies the three year requirement at least by virtue of: (a) McKinney's TBI—which followed a disease process (including a stroke) that

rendered him unable to independently assess whether to seek, and indeed ultimately to actually submit an application for the Purple Heart award, i.e., to seek the award without third-party assistance; (b) DoD's and Army's indication in April 2011 that injuries suffered since September 11, 2001 could still be subject to new Purple Heart review or "resubmitted" Purple Heart review; and/or (c) DOD's and Army's April 2011 "clarifying guidance to ensure the uniform application of advancements in medical knowledge and treatment protocols when considering recommendations for award of the Purple Heart for concussions (including mild traumatic brain and concussive injuries that do not result in a loss of consciousness)." Moreover, McKinney filed his request for correction with ABCMR within three years of each of Army HRC disapprovals of award of the Purple Heart to him on October 22, 2013 and/or June 19, 2014.

50.    McKinney has exhausted his administrative remedies.

51.    To the extent necessary, the entire time frame from October 9, 2005 through the date of McKinney's request for award of the Purple Heart and/or appeal to ABCMR concerning the disapproval of the award should be equitably tolled at least by virtue of: (a) McKinney's TBI—which followed a disease process (including a stroke) that rendered him unable to independently assess whether to seek, and indeed ultimately to actually submit an application for the Purple Heart award, i.e., to seek the award without third-party assistance; (b) DoD's and Army's indication in April 2011 that injuries suffered since September 11, 2001 could still be subject to new Purple Heart review or "resubmitted" Purple Heart review; and/or (c) DOD's and Army's April 2011 "clarifying guidance to ensure the uniform application of advancements in medical

knowledge and treatment protocols when considering recommendations for award of the Purple Heart for concussions (including mild traumatic brain and concussive injuries that do not result in a loss of consciousness)."

52.     The evidence before ABCMR from medical personnel who examined and treated McKinney directly contradicts the "Medical Opinion" on Form 507 from an Assistant Command Surgeon dated August 20, 2013, which was provided with the October 22, 2013 disapproval of the Purple Heart by Army HRC.  That opinion states that "[t]here is no doubt, given the [service member's ("SM")] current condition, that [McKinney] was exposed to concussive forces, [but McKinney's] TBI appears to be a cumulative affect as opposed to being caused by a specific event.  However, this falls out of the guidelines for the Purple Heart award."

53.     Yet, in reviewing the facts and circumstances concerning three different blast exposures (January 2005; 24 June 2005; 9 October 2005), a VA doctor who served in the Army Medical Corp assessed each of the three incidents and opined that only the third incident had the features of a TBI:

> During his deployment to Iraq [McKinney] suffered at least three exposures to explosions with 3 docume[nt]ed in my [History & Physical Examination].  The first two did not have the features of suffering a TBI as [McKinney] did not report either losing consciousness or having post traumatic amnesia. [H]owever the third event [] occur[r]ed during October 2005 when a roadside IED exploded about 20 meter[s] away. [T]his event is associated with post traumatic amnesia of less than one day duration.  The event is supported by the sworn statement of [the TC present in the B9 HUMMV with applicant]  .  .  .  My overall asses[s]ment is TBI from deployment related concussion due to IED exposure . . . The TBI opinion is further supported by a third party description

- 26 -

of [applicant's] actions/mental state immediately following the blast.

54.    Notwithstanding ABCMR's disapproval of a Purple Heart award to McKinney, the evidence provides medical documentation linking the date of October 9, 2005 for TBI and the need, under current medical protocols, for his immediate evaluation and treatment.

55.    Accepting that he was injured as a result of hostile action and that his injury required treatment by medical personnel, the only missing element for award of the Purple Heart is evidence that both diagnostic and treatment factors were present and documented in the Soldier's medical record by a medical officer.  Medical personnel, including a VA doctor who was an Army medical officer contemporaneously with McKinney, have verified both diagnostic and treatment factors.  It is reasonable to presume a record would have been created had medical personnel been present and if the operational tempo allowed for doing so.  As McKinney explained in seeking the Purple Heart award, he "did not see an Army medical [officer] or any other physician at that time [of the 9 October 2005 injury] because one was not available . . . I was on a Firebase that did not have a Medical Officer."

56.    McKinney has proven an error or injustice—failure to award him the Purple Heart for the TBI he sustained as a result of enemy action on October 9, 2005—by a preponderance of the evidence. *See* 32 C.F.R. § 581.3(e)(2).  The error and injustice in McKinney's record—the omitted documentation of his TBI and subsequent medical assessment and treatment in connection with that TBI—are readily apparent from the

evidence before ABCMR.   Indeed, ABCMR did not discredit any of the evidence submitted by McKinney.

57.    The failure of the Secretary, acting through ABCMR, to correct error and remove injustice by awarding McKinney the Purple Heart is agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(C).

58.    McKinney is therefore entitled to relief pursuant to the APA, 5 U.S.C. §§ 701-06.

## COUNT II
### ABCMR's Refusal to Unconditionally Excuse Any Alleged Untimeliness of McKinney's Request for the Purple Heart Violates the APA.

59.    McKinney reasserts and incorporates by reference each of the above paragraphs.

60.    The permitted time frame for applying to the Secretary to correct error and remove injustice is set forth in 10 U.S.C. § 1552(b), which states:

> No correction may be made . . . unless the claimant . . . files a request for the correction within three years after discovering the error or injustice. . . . A board . . . may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice.

61.    If the Secretary, acting through ABCMR, declines to excuse a failure to file within three years after discovery, then the Secretary must set forth reasoning and must connect the facts of the case to such decision.

62.    To decide whether to waive the time limitation, the Secretary, acting through ABCMR, must review the merits of an application seeking, in part, to waive the time limitation, including all facts and arguments presented, to determine whether a waiver would be "in the interest of justice."

63.    McKinney has produced substantial evidence that waiver of the three-year statute of limitations would serve the interest of justice, as it would allow ABCMR to adjudicate his meritorious claim.

64.    In its Record of Proceedings dated January 24, 2017, the Secretary, acting through ABCMR, stated:

> While it appears the applicant did not file within the time frame provided in the statute of limitations, the ABCMR has elected to conduct a substantive review of this case and, only to the extent relief, if any, is granted, has determined it is in the interest of justice to excuse the applicant's failure to timely file.  In all other respects, there are insufficient bases to waive the statute of limitations for timely filing.

65.    ABCMR provided no explanation concerning why McKinney allegedly "did not file within the time frame provided in the statute of limitations."

66.    There is no opinion provided or cited in the Record of Proceedings, medical or otherwise, stating that subsequent to his TBI (and despite his medical diagnosis of being permanently and totally disabled following the TBI), McKinney was capable of independently knowing he was eligible for and should have, himself, been capable of applying for award of the Purple Heart by a particular date.

67.    ABCMR's refusal to unconditionally excuse any alleged untimeliness of filing "in the interest of justice" is agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(C).

**C<span style="font-variant:small-caps">OUNT</span> III**
**ABCMR's Disapproval of the Purple Heart**
**for McKinney's TBI Violates 10 U.S.C. § 1552.**

68.     An "error" raised before the Secretary, acting through ABCMR, is that McKinney's medical record does not include a statement from a medical officer that the extent of McKinney's TBI was such that it would have required treatment by a medical officer, if one had been available to treat it.

69.     An "injustice" raised before ABCMR is that the missing statement from McKinney's medical record has prevented him from receiving the Purple Heart to which he is entitled.

70.     A VA doctor who served in Iraq as an Army medical officer contemporaneously with McKinney, who *did not* examine him immediately following the explosion but who *did* subsequently examine McKinney at the VA, has stated that McKinney's TBI sustained on October 9, 2005 was such that he would have required treatment by a medical officer if one had been available.  The VA doctor stated:

> Under current medical protocols i[t] would be expected that [McKinney] be removed from duty and immediately report to a medical facility for further eval[ua]tion and treatment. He would not return to duty till cleared by medical providers. The [Military Acute Concussion Evaluation a.k.a.] MACE exami[na]tion, however, did not exist on the battlefield in 2005.

71.     McKinney has proven an error or injustice—failure to award him the Purple Heart for the TBI he sustained as a result of enemy action on October 9, 2005—by a preponderance of the evidence.  *See* 32 C.F.R. § 581.3(e)(2).

72.     The Secretary, acting through ABCMR, clearly has the authority to correct McKinney's medical records if they contain an error or injustice (e.g., an omission).  *See* 10 U.S.C. § 1552(g).

73.     In the Record of Proceedings, the Secretary, acting through ABCMR, does not contend that the evidence furnished by McKinney is insufficient to justify a correction of his medical records.

74.     Failure of the Secretary, acting through ABCMR, to correct the error and remove the injustice that was clearly presented by McKinney violates the Secretary's statutory mandate under 10 U.S.C. § 1552.

75.     Such a violation—disapproving award of the Purple Heart contrary to the weight of the evidence—is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(C).

## REQUESTS FOR RELIEF

WHEREFORE, McKinney requests that the Court:

(1)     enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right, the Secretary's decision, acting through ABCMR, to disapprove award of the Purple Heart to McKinney;

(2)   enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that McKinney has met the criteria for award of the Purple Heart;

(3)   vacate and set aside the Secretary's findings and disapproval of McKinney's application for award of the Purple Heart, through ABCMR;

(4)   direct the Secretary, acting through ABCMR, to correct McKinney's medical records to reflect that he sustained a TBI on October 9, 2005, as a result of an IED explosion in Kirkuk, Iraq, that would have required treatment by a medical officer if one had been available;

(5)   direct the Secretary, acting through ABCMR, to certify that McKinney meets the requirements for award of the Purple Heart by virtue of his TBI incurred as a result of an IED explosion on October 9, 2005 in Kirkuk, Iraq;

(6)   direct the Secretary, acting through ABCMR, to award McKinney the Purple Heart;

(7)   award McKinney his costs and reasonable attorneys' fees incurred in this action; and

(8)   grant all other such relief to McKinney as deemed just, proper and equitable.

Dated:  February 19, 2018            Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
    Email:  watkins@wlapllc.com
WATKINS LAW & ADVOCACY, PLLC
1455 Pennsylvania Avenue NW, Suite 400

Washington, DC 20004
Telephone: (202) 355-9421
Facsimile: (202) 355-9424

*Attorney for Plaintiff*
*Hugh Campbell McKinney*